## THOMAS TIMOTHY *vs.* ANSEL WRIGHT.

A release by a convict imprisoned for unlawfully selling intoxicating liquors, which have been seized and destroyed under a statute the constitutionality of which is doubted, of all claims for damages against the magistrates, officers and others who ordered and executed such seizure and destruction, made in consideration of an agreement of third persons to render all necessary and proper services fairly to bring before the governor and council an application for his pardon, and delivered as his deed to another person, to be by him kept until the arrival of the pardon, and then delivered to the releasees, cannot be revoked; but upon the performance of the agreement, and the arrival of the pardon, takes effect as from the first delivery; and is not contrary to public policy.

ACTION OF TORT for breaking and entering the plaintiff's close in Northampton, and taking and carrying away intoxicating liquors and the vessels containing them.

Answer, a release under seal, dated August 7th 1854, which recited the seizure and destruction of said liquors by order of a justice of the peace, pursuant to *St.* 1852, *c.* 322, § 14, and that doubts had arisen as to the constitutionality of that statute; and proceeded thus: " Now therefore, for the quieting of all claims and demands for any damages or injuries by me sustained, by virtue of any entry on my premises or other acts in the seizure of said liquors belonging to me or in my possession, or their destruction as aforesaid, in consideration of one dollar to me paid by " the said magistrate, the complainants on whose complaint he acted, and the officers, of whom this defendant was one, who executed his orders, " the receipt whereof I do hereby acknowledge, I do hereby fully release and discharge them, and each of them, of and from all damages, injuries, costs, suits, charges and claims for, on account of, or by reason of any of the said seizures of liquors, or entry into my premises for the seizure or search for liquors therein, or for any other act or acts done by them, or either of them in the premises, in such entries, seizures, or the destruction of said liquors as aforesaid; intending hereby fully to release and acquit and discharge the said party, and each of them, of and from all claims and demands, suits, charges, injuries and costs, in any manner connected with, or relating to, said entries into premises occupied by me, or the seizure or de

struction of any liquors belonging to me or in my possession, from the beginning of the world to this date."

At the trial in the court of common pleas in Hampshire, at June term 1857, before *Morris*, J., the defendant produced and offered in evidence the release, and called Samuel Wells, an attesting witness, to prove its execution.

His testimony tended to show " that while Timothy was confined in the house of correction in Northampton, under a conviction for selling liquors contrary to law, he sent for the witness to come and see him ; that the witness went and found Timothy apparently much out of health, and desirous on that account of obtaining a pardon ; that he told Timothy that if he would promise to abstain from selling liquors, and would release all claim for damages upon those concerned in the seizure, people would be willing ' to interest themselves ' for him ; that at Timothy's request the witness prepared the release in question, and Timothy signed it in his presence, and requested him to take it and give it to Rev. John P. Hubbard, to be kept until Timothy got his pardon, and then given to the defendant; that shortly afterwards, and in consequence of Timothy's having signed said release, the witness prepared on Timothy's behalf an application to the governor and council for a pardon, intended also for signature by any who might be willing to sign it."

There was also evidence tending to show that the defendant carried the application for a pardon to Hubbard, and Hubbard and others interested themselves to obtain the pardon, and the application was laid before the governor and council; that it was the expectation of Timothy and those who interested themselves in his behalf, that the pardon would be obtained in a few days, but that it did not, in fact, arrive for about two months, and only three weeks before the expiration of his sentence ; and that about a week before it came, Timothy said to Wells and to Hubbard, that the pardon had been delayed so long, that he hould not stand by the release ; and, after his discharge from imprisonment, requested Hubbard not to give the release to the defendant, but to give it to him.

Hubbard testified that he, having previously spoken with

Timothy in prison on the subject, received the release from Wells with a note stating that if a pardon should be received the release was to be delivered to the defendant, if not, to Timothy; but " nothing was said about time as conditional"; that he received no instructions except from Timothy and Wells; that he kept the release until a week before the trial, and then, upon receiving, while absent, a notice that it would be needed on this trial, sent instructions that it should be given to the defendant to be handed to the court; and that he knew no reason why it should not be delivered to the defendant. There was other con-flicting evidence as to the instructions given by Hubbard for the delivery of the paper.

There was no evidence that any communication ever passed between the defendant or the other releasees and Timothy on the subject of the release before its execution; but the defendant relied on the above evidence as tending to show that said Wells and others not named in the release were acting for the benefit of the defendant, and that the defendant immediately after the preparation of the release was rendering services in furtherance of Timothy's pardon.

The plaintiff requested the court to instruct the jury as fol-lows: " 1st. That inasmuch as there was no consideration for the release, and no agreement between the defendant, or any of the parties affected, and Timothy, for such a release, it was inoperative, and the defendant acquired no right to it until it should be actually delivered. 2d. That, to constitute such a delivery, it must be made for the purpose of giving it effect as Timothy's deed. 3d. That sending to have it put into the defendant's hands, under all the circumstances and in the man-ner disclosed by the evidence, was not such a delivery as enti-tled the defendant to avail himself of it for his defence."

The court gave the second instruction requested; but instead of the first and third, instructed them as follows: " If the release was executed by the plaintiff spontaneously, without any con-sideration therefor, merely as an act of favor to the releasees, he might revoke it at any time before delivery; and if he put it into the hands of Hubbard merely for safe keeping until a pardon

Timothy *v.* Wright.

should be received, and then to be delivered to the defendant, and before it had been in fact delivered the plaintiff forbade its delivery, then it would be legally inoperative, although in the hands of the defendant. If, on the other hand, the execution of this paper and its delivery into the hands of Hubbard were in pursuance of an arrangement between the plaintiff and the other parties acting in behalf of the defendant and others, under which the plaintiff was to receive benefits as well as confer them, under which they were to do something for him, in return for which he was to release the defendant and others, and the defendant and those who acted with him performed their part, then the plaintiff could not revoke or rescind the release, but when the pardon should be received, the defendant would be entitled to have the release delivered to him, and any notice given by the plaintiff to Hubbard not to deliver it to the defendant, or any demand to have it redelivered to himself, would not prevent its taking effect as a release when subsequently delivered to the defendant."

The court further instructed the jury " that it was for them to determine upon the evidence whether an effectual delivery of the instrument had been made; that if they should find that the release had been executed and put into Hubbard's hands under a mutual arrangement as before stated, and the time had arrived, or the contingency had happened, upon which the defendant was entitled to have the release delivered to him, and in point of fact it had been given to him by Hubbard, or with his consent, it would be competent for them to infer that it was delivered in pursuance of said arrangement, unless the evidence repelled such inference ; and if so delivered, the defendant might properly avail himself of it in his defence."

The defendant thereupon requested the court to instruct the jury : " 1st. That the evidence would not justify the jury in finding any agreement on the part of the defendant or the others named as releasees, unless it be an agreement for the procurement of a pardon.   2d. That such an agreement would be against the policy of the law and void.   3d. That without such a legal agreement, the deposit with Hubbard would not give

any right or interest in the instrument to the defendant, and Timothy could revoke the authority to deliver at any time before the delivery was actually made, or at least before the contingency happened."

The court declined to instruct the jury according to the first of these propositions, but left it to the jury to determine upon the evidence what were the terms of the agreement referred to; and upon the second and third propositions instructed the jury, "that if the agreement was an absolute one, that the persons named in the release, or those acting in their behalf, should procure a pardon, or should procure signatures to an application for a pardon, it would be contrary to the policy of the law and void, and from it the defendant could derive no right or interest in the release; but if the agreement was, as contended by the defendants, merely an undertaking to render such services as were necessary and proper to be done in order to have the plaintiff's application for a pardon fairly brought before the governor and council, it would be valid, and the performance of such services, as the consideration of the release, would not make its execution and delivery void, or authorize the plaintiff to revoke it; that of the description of services or acts which might properly be done would be the preparing of an application for a pardon, or any other papers having reference to that object, the circulating of such a paper for the free and voluntary signature of persons disposed to sign it, care and attention necessary for securing the transmission of the proper papers to the governor and council, making such provisions as are usual and proper to have the case fairly presented to them. Acts and services of this kind, which the plaintiff, being in prison, could not personally perform, might well be done for him by others; and an agreement to perform them, or any of them, would be a valid agreement, there being no absolute undertaking to procure a pardon, nor to procure signatures to a petition for a pardon; and that such an agreement, made and performed by the defendant, or those acting in his behalf, would give him such an interest in the release executed by the plaintiff, and deposited in the hands of Hubbard in pursuance of it, for the benefit of the parties

concerned, that the plaintiff had no right to revoke it, and his attempt to do so had no effect upon the subsequent delivery."

The jury returned a verdict for the defendant, and the plaintiff alleged exceptions.

*J. Wells*, for the plaintiff, cited *Norman* v. *Cole*, 3 Esp. R. 253; *Hatzfield* v. *Gulden*, 7 Watts, 152; *Marshall* v. *Baltimore & Ohio Railroad*, 16 How. 314; *Fuller* v. *Dame*, 18 Pick. 472; Chit. Con. (8th Amer. ed.) 583.

*C. Delano*, for the defendant.

This case was decided at Boston in June 1858.

SHAW, C. J. It appears to the court that these instructions were correct. The release was under seal, and therefore imported a consideration. The only question of law, if the release was valid, was, whether it was delivered; and upon the evidence we can entertain no doubt that it was.

There is no pretence that this release was delivered to Hubbard as an escrow, to take effect only as the releasor's deed, upon a future delivery by the depositary to the releasee. The delivery was absolute as the releasor's deed, to take effect upon a contingency; but when the contingency happened, it became absolute as the releasor's deed, by relation, as from the first delivery, and it was not in the releasor's power to revoke or in any way recall it. This point, we think, is settled upon well established authorities, which might be much multiplied. *Wheelwright* v. *Wheelwright*, 2 Mass. 447. *Foster* v. *Mansfield*, 3 Met. 412.

The condition on which the release was to be delivered by Hubbard, as the releasor's deed, was not that the pardon should be determined within any time specified. All the releasees and other friends could do, was to take the proper measures for procuring a pardon; the time within which it should be done must necessarily depend on other parties. The release became absolute, and, by the terms on which it was deposited with Hubbard, was to be delivered by him, as soon as the pardon should be obtained.

It appears to us, that the only serious ground upon which the validity of this release can be called in question is, that it is against public policy for individuals to use their right and

power as citizens to petition for a pardon for a convict, upon any pecuniary or valuable consideration. But, after all, this must depend upon the circumstances of the particular case. We can easily conceive of a case where a promise by a convict, to a person supposed to have some influence with the executive, to pay money for the exercise of such influence in obtaining a pardon, would be void in point of law, as contrary to public policy, and to fair and upright dealing in public affairs.

But what are the circumstances of this case? The release itself shows, that the liquors had been seized and destroyed, under a judicial decision, as a legal penalty against the releasor; but that doubts had arisen whether that law was constitutional. If it was not, then he might have a suit for damages against the magistrates, the complainants, the executive officers, who actually executed the judgment and destroyed the liquors. The purpose of this release was to quiet their claims for extreme damages. But at the same time that the liquors were adjudged to be destroyed as a penalty for a violation of law, by force of the same law he was subjected to a personal penalty by imprisonment. Now it seems to us that it would be right and fit for those who were acquainted with all these circumstances, on being satisfied that the convict would relinquish this extreme claim for pure damages against those who acted, as they supposed, under the justification of the law, and in conformity with their duty, to apply to the executive to pardon the convict from the whole or part of the personal penalty; and that it would not be wrong or against public policy for the executive to receive and take such representations into consideration, in the exercise of his high prerogative.          *Exceptions overruled.*